UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| MARIA DE JESUS CANTU MARTINEZ, *et al.*, | § § | |
| Plaintiffs, | § § | |
| VS. | § § | CIVIL ACTION NO. 1:18-CV-092 |
| ANTONY BLINKEN, U.S. SECRETARY OF STATE, | § § § | |
| Defendant. | § § | |

## ORDER & OPINION

Siblings Maria de Jesus Cantu Martinez and Alberto Cantu Martinez filed this action under 8 U.S.C. § 1503(a) against Antony Blinken, United States Secretary of State, seeking a declaratory judgment that they are United States citizens. Maria and Alberto were born in Mexico to Maria del Rosario Martinez and Jorge Cantu Zamora. Plaintiffs' father was born in Mexico, but he acquired United States citizenship at birth through his mother (Plaintiffs' grandmother). Whether Plaintiffs Maria and Alberto acquired citizenship at birth through their father depends on whether he was physically present in the United States for the requisite number of years prior to their respective births.

In March 2023, the Court held a bench trial. Based on the record and the applicable law, the Court concludes that Plaintiffs Maria de Jesus Cantu Martinez and Alberto Cantu Martinez have each demonstrated by a preponderance of the evidence that they satisfy the statutory requirements to have acquired United States citizenship at birth.

I.  **Findings of Fact**

At trial, the Court heard testimony from Maria del Rosario Martinez (Plaintiffs' mother), Jorge Cantu Zamora (Plaintiffs' father), and Javier Cantu Zamora (Plaintiffs' uncle).[1] Based on

---

[1] Given the common surnames, the Court will refer to Plaintiffs' father and uncle by their first name.

their testimony, the admitted exhibits, and the parties' stipulated facts, the Court reaches the following findings of fact.

On March 9, 1950, Jorge was born in Mexico to Guadalupe Zamora, a United States citizen, and Santos Cantu Trevino, a Mexican citizen. Jorge's birth certificate lists "Buena Vista" as his birth place, but he testified that he was born in Rio Rico, Tamaulipas, Mexico, like his father, his aunts and uncles, and his nine siblings. (*See* Birth Certificate, Doc. 58-5, 24) Plaintiffs and the Government acknowledge that they are not aware of a location in Mexico known as "Buena Vista", and trial evidence supports that Jorge was born in Rio Rico. For example, in a sworn statement to an INS official, Jorge's mother stated that she gave birth to all her children in Rio Rico. (INS Statement, Doc. 58-5, 37) The Court finds that Rio Rico is Jorge's place of birth.

### A. Rio Rico and the Horcon Tract

At the time of Jorge's childhood, Rio Rico was a small town, with one main paved street connecting several dirt roads. The heart of the town consisted mainly of a school, a plaza, a police station, and a church. Rio Rico represented a border community, found less than a mile south of the Rio Grande River, which, since the Treaty of Guadalupe Hidalgo in 1848, has formed the United States's southern boundary in Texas.

Between 1848 and the end of that century, in the area now known as Rio Rico, the Rio Grande River weaved in a reverse-S curve, with the upper portion of the "S" representing Mexican territory, and the lower portion of the "S" laying within the United States. In other words, starting in the lower portion of the "S", an individual could begin in the United States and travel northward to enter Mexico.

Throughout the 1800s, the Horcon Tract, a parcel of land encompassing about 419 acres, was found in the lower portion of the "S" and thus within the United States. In 1906, however, a private irrigation company unlawfully changed the course of the Rio Grande River, cutting off the lower half of the "S" curve. Although this alteration placed the Horcon Tract completely south of the Rio Grande River, the two countries continued to recognize the Horcon Tract as United States

territory. This remained the case in 1929, when Rio Rico was founded, in an area that included the Horcon Tract. In other words, when Rio Rico came into being, the portion of the town represented by the Horcon Tract was United States territory. That special status ended in 1972, when the United States ceded the Horcon Tract to Mexico. But given the Horcon Tract's special status between 1929 and 1972, other courts have found that people living within the Horcon Tract during those years were within the United States. *See, e.g.*, *Matter of Cantu*, 17 I. & N. Dec. 190 (BIA 1978) (granting birthright citizenship to an individual born in the Horcon Tract before 1972); *Bermea v. Limon*, No. 1:15-CV-097, 2018 WL 4103011, at *2 (S.D. Tex. July 17, 2018) ("The United States eventually ceded the Horcon Tract land to Mexico in 1972, but individuals born there before 1972 can claim American citizenship.").

### B. Jorge's Childhood

Jorge grew up in Rio Rico, with most of his relatives living in the same town, and most of them within a few blocks of each other. (*See* List of Properties, Doc. 58-11, 1; Map, Doc. 58-11, 2) His family lived in a four-room adobe house located on his grandparents' property. Jorge cannot pinpoint the location of his childhood home, but he remembers that it lay about four or five blocks southwest of the town plaza.

Jorge and his siblings attended the local school, Escuela Primaria Amado Nervo, where their aunt taught. After school, Jorge and his siblings typically spent time in the town plaza playing with other children. As their home had no electricity or running water, Jorge and his siblings stayed in the plaza until evening, only going home to sleep. In short, when Jorge attended school, he spent the better part of the day in or near the town plaza. But he attended school for only about four years.

In 1964, at the age of 14, Jorge and some of his brothers moved to Nuevo Progreso, located four to five kilometers from Rio Rico. They lived and worked there for about four years.

### C. Jorge's Adulthood

In June 1968, Jorge and three of his brothers moved to the United States to work, joining their eldest brother, Fulgencio. (*See* Application for Certificate of Citizenship, Doc. 58-1, 58) At the time, Fulgencio already worked as a field laborer in the United States. Fulgencio's boss lent him money to help obtain permits for Jorge and his brothers to enter the United States. They initially worked together in Macon, Ohio, laboring there for seven or eight months.

In 1969, Jorge and his brothers moved south to Relampago, Texas, where they worked as field laborers. They periodically traveled to other states for specific jobs, but would return to south Texas.

The town of Relampago lies just north of the United States-Mexico border. While living in Relampago, Jorge at times visited the nearby Mexican town of Nuevo Progreso. In 1969, during one of those visits, he met Maria del Rosario Martinez, and they soon began dating. Jorge continued working in the United States, but would visit Martinez about every three months for a week at a time. He also visited family in Mexico on some of those trips.

On June 3, 1976, Martinez gave birth to Plaintiff Maria de Jesus Cantu Martinez in Tamaulipas, Mexico. (Birth Certificate, Doc. 42-1, 1–2) Five years later, Jorge and Martinez married. (Marriage Certificate, Doc. 42-2) And two years after their marriage, on April 1, 1983, Martinez gave birth to Plaintiff Alberto Cantu Martinez in Tamaulipas, Mexico. (Birth Certificate, Doc. 58-1, 21–22)

Throughout the 1970s and 1980s, Jorge maintained the same pattern. He lived and worked in south Texas, visiting Martinez and other family members in Mexico about every three months, staying for up to a week. He sent Martinez money to support her and the children. And in 1989, Jorge and Martinez relocated and began living together in Mercedes, Texas.

In 2014, Jorge acquired his United States Certificate of Citizenship (Doc. 58-5, 22).

A year later, Alberto applied for a United States Passport, with Maria doing the same in 2016. The United States Department of State denied both applications. (Alberto Denial Letter, Doc. 42-12; Maria Denial Letter, Doc. 42-8)

In June 2018, Plaintiffs filed this lawsuit.

## II.    Conclusions of Law

Plaintiffs bring this declaratory judgment action under 8 U.S.C. § 1503(a), which provides a mechanism for an individual within the United States to challenge the denial of a right or privilege based on the determination of citizenship.

### A.  Applicable Standard

Under Section 1503(a), "[t]he Court must make a *de novo* determination of whether a plaintiff is a United States citizen." *Garcia v. Clinton*, 915 F. Supp. 2d 831, 833 (S.D. Tex. 2012), *aff'd sub nom. Garcia v. Kerry*, 557 F. App'x 304 (5th Cir. 2014). "There are two sources of citizenship, and two only: birth and naturalization." *Bustamante-Barrera v. Gonzales*, 447 F.3d 388, 394 (5th Cir. 2006) (quoting *Miller v. Albright*, 523 U.S. 420, 423 (1998)). "Persons not born in the United States acquire citizenship by birth only as provided by Acts of Congress." *Thomas v. Lynch*, 796 F.3d 535, 538 (5th Cir. 2015) (quoting *Miller*, 523 U.S. at 424). Such acts of Congress include statutes that extend birthright citizenship to children born abroad when at least one parent is a United States citizen and certain statutory requirements are met. *Id*. "The applicable law for transmitting citizenship to a child born abroad when one parent is a citizen is the statute in effect at the time of the child's birth." *Iracheta v. Holder*, 730 F.3d 419, 423 (5th Cir. 2013).

In a Section 1503(a) case, the district court holds a bench trial and weighs the evidence, determines the credibility of witnesses, and resolves conflicting testimony. FED. R. CIV. P. 52(a)(1), (6); *United States v. Jennings*, 726 F.2d 189, 190 (5th Cir. 1984). A plaintiff "must prove citizenship by a preponderance of credible evidence." *Ayton v. Holder*, 686 F.3d 331, 335 (5th Cir. 2012); *see also* 22 C.F.R. § 51.40 ("The applicant has the burden of proving that he or she is a

U.S. citizen . . . ."). Proving a fact by a preponderance of the evidence means showing that the existence of that fact "is more likely than not." *Matter of Briscoe Enters., Ltd. II*, 994 F.2d 1160, 1164 (5th Cir. 1993).

As for testimony, courts weigh the credibility of witnesses, but receive a plaintiff's self-serving statements and those of interested witnesses "with a grain of salt." *De Vargas v. Brownell*, 251 F.2d 869, 871 (5th Cir. 1958); *see also Garcia*, 915 F. Supp. 2d at 835; *Patel v. Rice*, 403 F. Supp. 2d 560, 565 (N.D. Tex. 2005), *aff'd*, 224 F. App'x 414 (5th Cir. 2007).

### B. Applicable Law at the Time of Plaintiffs' Births

In the current matter, the parties do not dispute that Maria and Alberto were born in Mexico, that their father was a United States citizen, and that their mother was a citizen of Mexico. As a result, Maria's and Alberto's claims of acquired citizenship at birth are based on the provisions of the Immigration and Nationality Act (INA) that applies to children born in a foreign country, to one parent who at the time was a U.S. citizen and one parent who was an alien.

In 1976 and 1983, the year of Maria's and Alberto's respective births, the INA provided the same requirements for U.S. citizenship: Before each of Maria's and Alberto's birth, their U.S. citizen father must have been "physically present in the United States or its outlying possessions for a period or periods totaling not less than ten years, at least five of which were after attaining the age of fourteen years". 8 U.S.C. § 1401(g) (1982); 8 U.S.C. § 1401(a)(7) (1976).[2]

The physical presence requirement can be met through the cumulation of non-continuous periods of time within the United States. *See id.* ("period or periods"); *see also United States v. Garza-Flores*, No. 2:20-CR-00953, 2021 WL 5771866, at *6 (S.D. Tex. Dec. 5, 2021) ("An individual does not need to be physically present in the United States *continuously*."); *Fernandez Cardona v. Garland*, No. 7:19-CV-2, 2021 WL 3148868, at *4 (S.D. Tex. June 22, 2021), *report*

---

[2] As Maria was born out of wedlock, the INA at the relevant time also required that she be legitimated before the age of 21. *See* 8 U.S.C. § 1409 (1976). The parties do not dispute that the marriage of Maria's parents in 1981 satisfies this requirement. (*See* Answer, Doc. 11, ¶ 12 (conceding that "the only thing left to prove" is whether Jorge had been physically present in the United States the requisite number of years))

*and recommendation adopted sub nom. Fernandez Cardona v. Barr*, No. 7:19-CV-002, 2021 WL 3144540 (S.D. Tex. July 26, 2021) ("Physical presence, however does not have to be continuous".).

Accordingly, Maria and Alberto must prove by a preponderance of the evidence that their father was physically present in the United States for a period or periods totaling ten years before their respective births, at least five years of which must have occurred after Jorge turned 14 years of age.

### C. Jorge's Physical Presence in the United States

#### 1. Jorge's Childhood

From the time that Jorge was born in March 1950, until he and some of his brothers moved to Nuevo Progreso in 1964, Jorge lived in Rio Rico. At the time, the Horcon Tract, which formed part, but not all of Rio Rico, represented United States territory. The parties agree on the boundaries of the Horcon Tract, and the trial record includes a map delineating those boundaries and identifying the known owners of some of the properties. (*See* Map, Doc. 58-11, 2; Map, Doc. 58-10; List, Doc. 58-11, 1) The Court finds that the school (Property #22) and the town plaza were within the Horcon Tract and formed part of the United States until 1972. The Court also finds that the following properties belonged to Jorge's family members and, before 1972, were located within the United States: Property #17, Property #22, Property #41, Property #54, Property #64, Property #65, and Property #77. (List, Doc. 58-11, 1)

At trial, neither Jorge nor his brother Javier could pinpoint the location of their childhood home. Using the map, however, they each identified a general area about four to five blocks southwest of the school. They recalled that they lived on property that their grandparent owned, and the Rio Rico map includes Property #77, which is labeled as belonging to Santos Cantu (their grandfather) and is about four to five blocks southwest of the school and town plaza. (*See* Map, Doc. 58-11, 2) Some of the property labeled as Santos Cantu's appears to fall within the Horcon Tract, but no evidence at trial indicated that the home itself was on property that fell within the United States. As a result, Plaintiffs have not proved by a preponderance of the evidence that

Jorge's childhood home was located within the United States, meaning that any time that Jorge spent at his home would not count toward the time requirement for physical presence in the United States.

Still, the trial evidence demonstrated that throughout Jorge's childhood, he spent considerable time at the school, town plaza, and relatives' homes that were located within the United States before 1972. The moments that he spent in these areas represent time that he was physically present in the United States. Most significantly, Jorge testified that he attended school for four years, and that during this time, when classes ended, he remained near the town plaza to play with other children. On regular occasions, he returned home only to sleep. The Court finds that based on the trial record, it is more likely than not that during these four years of education, Jorge spent 35% of his time on property considered to be within the United States.[3] As to the remaining ten years of his childhood that he lived in Rio Rico, the trial record only supports a finding that he spent some time within United States property, represented by the moments when he played in the town plaza or visited relatives' homes that fell within the Horcon Tract. For these remaining years, the Court finds that Jorge spent 15% of his time on property considered to be within the United States. Based on these findings, the Court calculates that between March 9, 1950, and December 31, 1963, Jorge was physically present within the United States for 1,048 days.[4]

### 2. Jorge's Adulthood Working in the United States

At trial, Jorge testified that starting in June 1968, he and three of his brothers moved to the United States to work. He initially traveled to Ohio, and then moved to Relampago, Texas, where he remained until 1989. At times, he spent time in others states as a migrant farmer, but

---

[3] This finding takes into account that on school days, Jorge spent a significant majority of the day within United States property, but that he did not attend school on weekends or when classes were not in session.
[4] As the calculation with respect to Maria proves very close to the ten-year requirement, the Court calculates Jorge's physical presence by days, which represents the most exact determination. For 1964, the Court does not attribute any time to Jorge's physical presence in the United States. Jorge moved from Rio Rico to Nuevo Progreso in that year, and the trial record does not indicate in what month the move occurred.

would return to Relampago.  Two of his brothers corroborated the timing and details of Jorge's work in the United States.

During these years, Jorge visited Mexico on a regular basis.  Beginning in 1968, he visited Nuevo Progreso, a Mexican town across the border and near Relampago.  He met his wife there.  She recalled that between 1969 and 1989, Jorge worked in the United States, but would visit her and, later, their children on a regular basis.

The trial record contains conflicting evidence regarding the frequency and length of Jorge's visits to Mexico.  Javier Cantu testified that Jorge went to Mexico once every four months, staying only for a weekend.  Jorge and Martinez initially provided similar testimony, but on cross examination conceded that in pre-trial depositions, they indicated that Jorge visited Mexico every two or three months, staying up to a week at time.  Based on the trial record and taking into consideration the credibility of the witnesses, the Court finds that between June 1, 1968, and April 1, 1983, it is more likely than not that Jorge traveled to Mexico on average once every three months, staying for an average of one week on each occasion.  This finding leads the Court to conclude that during this time period, Jorge spent 84 days per annual quarter in the United States.

**D. Application as to Plaintiff Maria de Jesus Cantu Martinez**

As previously explained, the Court finds that before Jorge turned 14 years old, he was physically present in the United States for 1,048 days, represented by the time he spent in the Horcon Tract in his hometown of Rio Rico.  In addition, beginning on June 1, 1968, until Maria's birth, Jorge spent 84 days per annual quarter in the United States, amounting to 2,683 days when he was physically present in the United States.[5]

In total, before Maria's birth, Jorge was physically present in the United States for 3,731 days, which represents slightly more than 3,650, the number of days in ten years.  As a result, the Court concludes that Plaintiff Maria de Jesus Cantu Martinez has shown by a preponderance of

---

[5] For June 1968, the Court attributed 23 days to Jorge's physical presence in the United States.  In other words, the Court accepted that Jorge's quarterly visit to Mexico occurred during that month.  The Court likewise subtracted seven days for the period of April 1, 1976, through June 3, 1976, the date of Maria's birth.

the evidence that her father was physically present in the United States for at least ten years prior to June 3, 1976, with no more than five of those years before he turned 14.

### E. Application as to Plaintiff Alberto Cantu Martinez

Again, the Court finds that before Jorge turned 14 years old, he was physically present in the United States for 1,048 days, represented by the time he spent in the Horcon Tract in his hometown of Rio Rico. In addition, beginning on June 1, 1968, until Alberto's birth, Jorge was physically present in the United States for 4,978 days.[6]

In total, before Alberto's birth, Jorge was physically present in the United States for 6,026 days, significantly more than the 3,650 days represented by ten years. As a result, the Court concludes that Plaintiff Alberto Cantu Martinez has shown by a preponderance that his father was physically present in the United States for at least ten years prior to April 1, 1983, with no more than five of those years before he turned 14.

## III. Conclusion

Based on the Court's findings of fact and the applicable law, it is:

**ORDERED** that Plaintiff Maria de Jesus Cantu Martinez's request for a declaratory judgment under 8 U.S.C. § 1503(a) is **GRANTED**; and

**ORDERED** that Plaintiff Alberto Cantu Martinez's request for a declaratory judgment under 8 U.S.C. § 1503(a) is **GRANTED**.

The Court will separately issue a Final Declaratory Judgment in accordance with this Order and Opinion.

Signed on May 15, 2023.

*Fernando Rodriguez, Jr.*
Fernando Rodriguez, Jr.
United States District Judge

---

[6] As with the calculation for Maria, the Court subtracted seven days for any partial quarter relevant to the calculation for Alberto.